**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. |
| | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| INTERIOR; DEBRA ANN HAALAND, in her | ) | |
| official capacity as Secretary of Interior; THE | ) | |
| BUREAU OF LAND MANAGEMENT; | ) | |
| TRACY STONE MANNING, in her official | | |
| capacity as the Director of the Bureau of Land | | |
| Management; and SONYA GERMANN, in her | | |
| official capacity as the Director of the Montana- | | |
| Dakotas Bureau of Land Management | | |
| | | |
| Defendants. | | |

---

**COMPLAINT FOR REVIEW OF FINAL AGENCY ACTION**

---

The State of North Dakota ("State" or "North Dakota") hereby petitions the Court for review of the cancellation of seven quarterly federal oil and gas lease sales in North Dakota during 2021 and 2022 imposed by the United States Department of Interior, the Secretary of the Interior ("Secretary"), and the Bureau of Land Management ("BLM") (collectively "Federal Defendants").

**INTRODUCTION**

Oil and gas production are central to North Dakota's economy and the welfare of its citizens, responsible for 54% of the value of the State's economy, generating approximately 76% of the State's tax revenue and creating approximately 66,000 good-paying jobs in the State. Oil and gas produced from leases on Federal and Indian lands in North Dakota are an important part of this sector, generating approximately $167.4 million in royalties to the State every year. These

royalties are distributed by North Dakota to support public schools, highways, local governments, and the State's budget reserve account.

The importance of BLM-administered oil and gas leases in North Dakota is magnified by the unique "split estate" nature of much of the surface and mineral ownership interests in North Dakota. Unique to North Dakota, the "split estate" nature of mineral ownership allows relatively small Federal mineral interests to control exploration and production from much larger pooled and co-located State and private surface mineral interests that are jointly operated under Communitization Agreements that include the Federal government. In other words, the Federal Defendants failure to hold quarterly oil and gas lease sales impairs North Dakota's sovereign ability to develop its co-mingled state and private mineral interests.

The Mineral Leasing Act ("MLA") provides that "[l]ease sales **<u>shall</u>** be held for each State where eligible lands are available **<u>at least quarterly</u>** and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(emphasis added). Federal Defendants have failed to comply with this mandatory statutory duty, only holding a singular quarterly lease sale in the last two years.

In order to meet its obligation to hold quarterly lease sales, BLM must hold four lease sales per year by the end of each quarter. In 2021, BLM violated the MLA by failing to hold a single quarterly lease sale in the Montana-Dakota's region. In 2022, BLM held a lone quarterly lease sale in Q2 of 2022. BLM failed to hold the statutorily required quarterly lease sales in Q1, Q3, and Q4 of 2022. And since the single Q2 2022 quarterly lease sale, Federal Defendants have made no public postings on the BLM's Montana-Dakota's website, and appear to not have begun any of the standard preparatory work necessary before future quarterly lease sales can resume. Federal

Defendants continue to indefinitely cancel quarterly lease sales in violations of their statutory duties.

All of these unlawful cancellations were apparently in response to President Biden's Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, on January 27, 2021. *See* 86 Fed. Reg. 7619 (Feb. 1, 2021)("Executive Order").  This Executive Order provides that "to the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review." *Id*. at § 206.  Ignoring the Executive Orders admonition to act consistent with applicable law, the Federal Defendants' actions violated several Federal statutes and exceeded their limited scope of discretionary authority.

BLM does not have the discretionary authority to suspend the regular quarterly lease sales required by the MLA without ***first*** complying with the notice and comment rulemaking process laid out by statute.  The Federal Land Policy and Management Act ("FLPMA") imposes detailed procedural requirements on any substantial change in land management policy.  *See, e.g.,* 43 U.S.C. §§ 1739(e); 1712(f); & 1714(h).  This includes specific and express limitations on the authority of the Secretary to withdraw lands from leasing. 43 U.S.C. § 1714 ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section.").  Both lease withdrawals and deviations from or amendments to the North Dakota Resource Management Plans (which includes quarterly leasing) are final agency actions, subject to the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA"), and there is nothing in the FLPMA that would allow Federal Defendants to change their land management practices at the beginning of this administrative process rather than following its completion.

The illegality of these actions is compounded in North Dakota by the split estate framework and resulting checkerboard nature of federal oil and gas interests which acts as a "force multiplier" to also block the development of pooled State and private mineral interests. The Federal Defendants' unlawful moratorium has blocked the development of more State and private mineral interests in North Dakota than federal interests, thus unlawfully exercising federal control over State and private mineral interests to an extent not authorized by statute. Federal Defendants' unlawfully exercised leverage over State and private split estate interests also adversely effects North Dakota's sovereign rights to regulate the efficient, safe, and environmentally sound development of the State's natural resources, amplifying the already significant damages to North Dakota's citizens and economy caused by the loss of royalties from the Federal Defendants' failure to hold quarterly lease sales of federal mineral interests as required by the MLA.

Further, Federal Defendants have exceeded their statutory authority granted under the MLA and FLPMA by unlawfully extending federal jurisdiction to block the development of extensive State and private mineral interests that are pooled with small federal mineral interests. Federal Defendants' arbitrary decision to cancel oil and gas leases violates several major Federal statutes, including those aimed at recognizing the critical role of states like North Dakota, managing natural resources, protecting the environment, and ensuring due process in Executive Branch administrative decisions.

Federal Defendants' arbitrary and unlawful lease sale cancellations in North Dakota, and the accompanying substantial changes to federal land management policy, were final agency actions subject to review under the APA. 5 U.S.C. § 706. These unlawful delays and cancellations of specific lease sales in North Dakota have already caused and will continue to cause significant and irreparable harm to North Dakota, are unlawful and arbitrary, and must be set aside. The

cancellations: (1) are an unlawful mineral withdrawal under the Federal Land Policy and Management Act; (2) violate the applicable Resource Management Plans which have designated specific areas of the public lands as open to oil and gas leasing; (3) violate the Mineral Leasing Act and its implementing regulations requiring quarterly lease sales; (4) violate the Administrative Procedure Act; and (5) violate the National Environmental Policy Act by failing to consider the environmental impacts of suspending federal oil and gas leasing **before** taking that action.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 because the claims presented arise under federal law and 5 U.S.C. §§ 702 and 706 which waive the United States' sovereign immunity.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because Petitioner, the State of North Dakota, resides within the District of North Dakota and because the property subject to the action is situated in the District of North Dakota.

## PARTIES

3.      Plaintiff State of North Dakota is one of the States of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens and is responsible for managing natural resources, including oil and gas exploration and production in the State, and obtains a large share of its tax revenue directly and indirectly from oil and gas development.

4.      Federal Defendant United States Department of Interior is an Executive Branch agency that administers millions of acres of land and mineral estates owned by the Federal Government in North Dakota.

5.      Federal Defendant Secretary Debra Haaland is Secretary of the United States Department of the Interior and is sued in her official capacity.

6.      Federal Defendant BLM is a sub-component of the United States Department of the Interior. BLM is the custodian of the federal mineral estate and is responsible for the administration and management of oil and gas development on federal lands.

7.      Federal Defendant Tracy Stone Manning is Director of the Bureau of Land Management and is sued in her official capacity.

8.      Federal Defendant Sonya Germann is Director of the Montana-Dakotas Bureau of Land Management and is sued in her official capacity.

## FACTS

**A.      Federal Defendants Have a Statutory Duty Under the Mineral Leasing Act to Hold Quarterly Lease Sales When Lands are Available.**

9.      The MLA requires that oil and gas "[l]ease sales **shall** be held for each State where eligible lands are available **at least quarterly** and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A) (emphasis added).

10.      The MLA further provides that for oil and natural gas leases on federal lands (which includes the mandated quarterly leases) 50 percent of bonuses, production royalties, and other revenues are granted to the State in which the lease is located, and 40 percent is granted to the Reclamation Fund, which maintains agricultural irrigation systems in several Western States, including North Dakota.[1]  30 U.S.C. §191(a).

11.      North Dakota therefore has a vested statutory right under the MLA in the quarterly lease sales, both through its direct interest in the bonuses, production royalties, and other revenues

---

[1] Section 1 of the Reclamation Act of June 17, 1902 allocates funds to "California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, **North Dakota**, Oklahoma, Oregon, South Dakota, Utah, Washington, and Wyoming" for the "construction and maintenance of irrigation works for the storage, diversion, and development of waters for the reclamation of arid and semiarid lands in the said States and Territories."  (Emphasis added)

which are statutorily granted to North Dakota from those lease sales, as well as its interest in the split-estate nature of leases in North Dakota.

12.    BLM's own regulations also reiterate the statutory requirement for conducting quarterly lease sales and state that "[e]ach proper BLM State office **shall** hold sales **at least quarterly** if lands are available for competitive leasing." 43 C.F.R. § 3120.1–2 (emphasis added). BLM state offices are in charge of identifying which specific parcels to offer for lease in a competitive lease sale. *See* 43 C.F.R. Subpart 3120.  Lands available for leasing "shall be offered for competitive bidding" and include, but are not limited to, "[l]ands included in any expression of interest." 43 C.F.R. § 3120.1-1(e).

13.    Lands "available" for leasing are described in 43 C.F.R. § 3120.1-1 and include, but are not limited to lands where leases have terminated or expired, lands subject to drainage, lands included in any expression of interest ("EOI"), and lands selected by the authorized officer. See 43 C.F.R. § 3120.1-1. When the regulation requiring quarterly lease sales of available land was promulgated in 1988, the then-Secretary explained "**[t]he term 'available' means any lands subject to leasing under the Mineral Leasing Act**." 53 Fed. Reg. 22814, 22828 (June 17, 1988) (emphasis added).

14.    BLM's regulations further reiterate that lands "eligible" for leasing become "available" when they are "**included in any expression of interest** or noncompetitive offer." *See* 43 C.F.R. § 3120.1-1(e) (emphasis added); *see also WEA v. Zinke*, 877 F.3d 1157, 1162 (2017) (BLM's "regulations provide that '[l]ands included in any expression of interest' are 'available for leasing' and 'shall be offered for competitive bidding.'").

15.    When lands are made "available" through inclusion in an EOI or otherwise, the available lands are then either submitted to the BLM, or in the case of when the surface lands are

7

controlled by a different agency, the appropriate surface management agency ("SMA") for NEPA review.  The BLM, or SMA, then grants or denies the necessary consent for the available lands to proceed to leasing, including a NEPA analysis in support of the sale of the available lands.  *See e.g.* 36 C.F.R. 228.102 (Governing leasing decisions by the Forest Service, a SMA, and stating that "[a]t such time as specific lands are being considered for leasing, the Regional Forester shall review the area or Forest-wide leasing decision and shall authorize the Bureau of Land Management to offer specific lands for lease subject to [verifying NEPA documentation is sufficient and compliance with resource management plans].").

16.     Importantly, neither BLM nor the appropriate SMA makes the determination of whether lands are "available."  Instead, they review the already "available" lands to determine if the lands have adequate NEPA analyses, leasing would be in compliance with resource management plans, and other statutory factors.  Additionally, under the MLA neither BLM nor the SMA can refuse to conduct these analyses.

17.     Thus, where lands are available, the BLM has a duty to ensure that the necessary steps are taken to hold quarterly lease sales at least quarterly.

**B.     North Dakota has Substantial State Interests in Regularly Scheduled Lease Sales on Federal Lands in North Dakota.**

18.     The State of North Dakota is ranked 3rd in the United States among all states in the production of oil and gas. North Dakota produces over 400,000,000 barrels of oil per year ("bbl") and over 1,000,000,000 million cubic feet ("mmcf") of natural gas per year.  Of those total annual volumes, approximately 149 million bbl and 373 million mcf of natural gas are produced by mineral interests on federal and Indian lands located in the State.

19.     Over fifty percent of North Dakota's general fund revenues are derived directly from oil and gas taxes, and sixty-six percent of the total of all tax and fee revenue received by the

State comes from oil and gas extraction and production taxes (based on the March 2021 North Dakota legislative revenue forecast, which projects oil production averaging 1.05 million barrels per day over the next two-year budget period, resulting in $3.7 billion in tax revenue).

20.     The oil and gas sector directly employs approximately 24,000 citizens of North Dakota and indirectly employs another 35,000, for a total of almost 59,000 jobs in the State.

21.     The BLM Montana/Dakotas Field Office manages over 4.1 million acres of Federal and Indian Trust mineral estate in the western one-third of the State and about 58,000 acres of public lands, mostly in Dunn and Bowman Counties.

22.     The BLM Montana/Dakotas Field Office manages approximately 1,700 Federal oil and gas leases, and also has trust responsibility for over 3,000 oil and gas leases located on the Fort Berthold Reservation or on Turtle Mountain Tracts.

23.     North Dakota receives 48 percent of the bonuses, production royalties, and other revenues from oil and gas leasing on federal lands.  *See* 30 U.S.C. § 191(a) & (b).  In 2021, these payments added up to $167.4 million.  Federal mineral leasing revenues are distributed to North Dakota which then support public schools, highways, local governments, and the State's budget reserve account.

**C. Impact of BLM's Cancellations on State and Private Mineral Interests in North Dakota's Split Estates.**

24.     North Dakota Century Code § 38-08-01 requires the North Dakota Industrial Commission to support the development, production, and utilization of oil and gas while preventing waste of these resources and protecting the correlative rights of all owners.  The North Dakota Industrial Commission is comprised of the Governor, the Agricultural Commissioner, and the Attorney General.

25.    A large percentage of mineral interests in North Dakota are subject to a unique and significant "split estate" arrangement whereby State and private mineral interests are frequently pooled with federal interests, and with all the mineral interests jointly managed through binding agreements.  This means that any refusal by Federal Defendants to lease federal mineral interests that are a part of a spacing unit impairs the non-federal mineral interests in that spacing unit, particularly if the federal, State, and private mineral interests have been pooled, subjecting the non-federal mineral interest development to Communitization Agreements.

26.    Unlike many Western States with large blocks of land where the federal government owns both the surface and mineral estates, more than 97% of the surface and mineral estates in North Dakota were once owned either by the State or private interests as a result of the Congressional railroad and homestead acts of the late 1800s.

27.    During the depression and drought years of the 1930s, however, many small private tracts in North Dakota went through foreclosure. Through the Federal Land Bank and the Bankhead Jones Act, the federal government foreclosed on many North Dakota farms, taking ownership of both the mineral and surface estates of private properties scattered throughout the State.

28.    While most surface estates were eventually sold back to the State or into the private sector, the federal government frequently retained the mineral rights.  This separation of federal mineral ownership from private/State surface ownership created North Dakota's unique "split estate" situation, with federal mineral interests effecting over 30% of the spacing units in the State, creating a checkerboard of lands with private or state surface ownership and a mix of federal, state, and private mineral ownership.

29.     There are a few large blocks of federal mineral ownership or trust responsibility in North Dakota where the federal government manages the surface estate through SMAs, including the U.S. Forest Service or Bureau of Indian Affairs. These are on the Dakota Prairie Grasslands in southern McKenzie and northern Billings County as well as on the Fort Berthold Indian Reservation.  However, even within those areas, the State of North Dakota owns all water rights and federal mineral ownership is interspersed with a "checkerboard" of private and state mineral or surface ownership. Therefore, virtually all federal management of North Dakota's oil and gas producing region consists of some form of split estate.

30.     In areas where SMAs manage the surface estates, the Federal Defendants, and specifically BLM, have an even more truncated role in the quarterly leasing process.  Once lands are made "available" through nomination in an EOI or otherwise, it is up to the SMA, and not BLM, to determine whether the lands can proceed to quarterly leasing.

31.     This proliferation of scattered small federal mineral interests gives the United States significant influence over the development and production of oil and gas from co-located or nearby private and state-owned mineral interests in split estates.  This is because of the regulatory framework established by North Dakota to promote the efficient, fair, and non-wasteful development of the State's natural resources.

32.     Oil and gas development and production in North Dakota is generally managed in terms of "spacing units," which are typically 1280 acres in size (one mile by two).  In order to promote and coordinate the efficient and fair development of North Dakota's natural resources and avoid waste, North Dakota by statute authorizes the "pooling" of different mineral interests within spacing units.  *See*, N.D. Cent. Code § 38-08-08.  North Dakota law establishes rules by which the various mineral interests involved in pooling arrangements share both the costs and benefits of a

cooperative approach to developing the pooled or unitized oil and gas interests.  *See*, N.D. Cent. Code CHAPTER 38-08.

33.    When a pooled spacing unit includes federal mineral interests, as is frequently the case in the split estate context of North Dakota, the Minerals Leasing Act allows lessees of federal minerals to conform to North Dakota's spacing unit and pooling rules through what is known as a Communitization Agreement, subject to BLM approval.  30 U.S.C. § 226(m); 43 CFR § 3105; BLM Manual 3160-9.06 ("The Bureau usually will require operators of Federal and Indian leases to adhere to the well spacing and well location requirements established by the appropriate State regulatory bodies, while reserving the right to impose different requirements in those instances where adherence to a State's requirement is considered not to be in the public interest or in the interest of the Indian lessors.").  Communitization Agreements allow the combination of small tracts, of which one or more is a federal or Indian interest, for the purpose of committing enough acreage to form the spacing/proration unit necessary to comply with North Dakota's conservation requirements and to enable the development of these separate interests which could not be independently developed in compliance with applicable requirements.  Federal Defendant BLM has promulgated regulatory requirements for Communitization Agreements and has also published extensive guidance on such agreements.  *See*, 43 CFR 3105, 25 CFR Parts 211 and 212, BLM Manual 3160-9.

34.    Under these BLM Communitization Agreements for split estate spacing units with a combination of State, private, and federal mineral interests, the presumption is that the development of the State or private interests will impact the federal mineral interests.  That is the underlying concept of pooling mineral interests for purposes of fair and efficient development: the development of any one entity's mineral interests in the pool is part and parcel of the development

of all of the pooled interests.  The BLM Communitization Agreement establishes the rules for the exploration and production of oil and gas from the entire split estate spacing unit, not just the federal mineral interests in the pooled or communitized spacing unit.  Thus exploration and production activities that take place solely on the State or private portions of the communitized spacing unit are subject to the BLM Communitization Agreement.

35.    Development or production of State or private mineral interests that are subject to the BLM Communitization Agreement must be approved by BLM.  This reflects the underlying presumption that any production from State or private mineral interests in a spacing unit pooled with federal interests will also draw federal oil or natural gas on which royalties must be paid.

36.    If the federal mineral interests that are part of a pooled spacing unit and subject to a Communitization Agreement are not leased, BLM will not approve the exploration and production of oil and gas from some or all of the wells within the pooled State or private mineral interests because BLM cannot allow exploration and production activities that will draw from, and thus trespass upon, unleased federal mineral interests.

37.    Sparse federal mineral interests can thus block the development of private and State interests.  For example, in North Dakota Industrial Commission Case Number 28194, 20 acres of unleased federal minerals in a 1280-acre spacing unit (just a mere 1.6% of the mineral interests in that unit) are blocking development of all other mineral interests in that unit.

38.    Accordingly, Federal Defendants' unlawful and arbitrary moratorium on leasing federal mineral interests that are pooled or communitized with State and private mineral interests (which may be subject to Communitization Agreements) not only removes those federal interests from the market, it also effectively freezes the development of communitized (and typically larger) State and private mineral interests because BLM can not grant permits to wells that develop those

State or private interests.  In this manner, Federal Defendants, through their unlawful moratorium on leasing federal mineral interests, are also unlawfully extending their limited jurisdiction under the MLA by blocking the exploration and production of oil and gas from State and private mineral interests.

39.    Federal Defendants are also unlawfully depriving the State of North Dakota of, and interfering with, its sovereign rights and authority to regulate the management and development of those State and private mineral interests.  By blocking the development of the State and private mineral interests, the unilateral actions of the Federal Defendants have deprived North Dakota of its ability to regulate such development, effectively exercising an unlawful federal veto over North Dakota's authority to regulate the development of State and privately-owned natural resources in the State. *See* N.D. CENT. CODE § 54-17.5-01 (the North Dakota legislature declaring it to be an essential government function and public purpose to "foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste.").

**D.    BLM's Unlawful Cancellation of Oil and Gas Lease Auctions In North Dakota.**

40.    The MLA, 30 U.S.C. §§ 181-287, mandates the frequency with which federal minerals must be made available for lease.  "Lease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b).

41.    BLM's regulations also require that: "Each proper BLM Sate [sic] office shall hold sales at least quarterly if lands are available for competitive leasing." 43 C.F.R. § 3120.1-2.

42.    BLM has held quarterly leasing sales on federal lands pursuant to the MLA for thirty years.

43.     BLM's regulations provide that "Lands included in any expression of interest" are "available for leasing." 43 C.F.R. § 3120.1-1(e).  "Expressions of interest" in specific tracts are submitted to BLM by entities interested in leasing those federal mineral interests, and are often referred to as "nominated" tracts. BLM's regulations require that "[a]ll lands available for leasing shall be offered for competitive leasing." 43 C.F.R. § 3120.1-1.  Thus tracts for which expressions of interest have been submitted are nominated tracts available for leasing.  BLM evaluates the nominated tracts to determine if any environmental reviews or studies are necessary prior to a tract being put up for auction (e.g., reviews under NEPA).  Tracts for which such additional review or studies are not necessary are put into queue for the quarterly auctions.

44.     BLM normally posts notices of competitive lease sales and NEPA compliance documentation at least 90-days prior to conducting a competitive auction. 43 C.F.R. § 3120.4-1; BLM Manual 3120.52.  At a minimum, BLM must post notices at least forty-five days before conducting a competitive lease sale. 43 C.F.R. § 3120.4-2.

45.     As of the date of this Complaint, there are approximately 875 pending nominated tracts in North Dakota for which expressions of interest have been submitted to BLM.  Of those, 177 tracts have fully completed the administrative evaluation process, including the NEPA compliance process, and are ready to be scheduled for sale.

**E. North Dakota's Existing Challenge to BLM's Unlawful Cancellation of Oil and Gas Lease Auctions in North Dakota.**

46.     Previously, North Dakota challenged the Federal Defendants cancellation of the Q1 and Q2 2021 quarterly lease sales.  *See State of North Dakota v. The United States Department of Interior, et al.* 1:21-cv-00148 (D. N.D.), ECF No. 1 (the "2021 Lease Cancellation Challenge).

47.     In that action, the Court previously denied *without prejudice* North Dakota Motion for Writ of Mandamus, noting that the Federal Defendants gave "assurances at the hearing the

process to start Federal oil and gas leasing sales in North Dakota was imminent" but that "[i]f the Defendants do not hold to their word and cancel any planned future sale, North Dakota may bring this action for review of the specifically cancelled sales once this Court has the benefit of a complete record." *See id*, ECF No. 38 at 9.

48.    The Court also declined to enforce a nationwide preliminary injunction issued in the Western District of Louisiana (*see State of Louisiana et al. v. Joseph R. Biden, Jr., et al.*, 2:21-cv-00778 (W.D. La. June 15, 2021) (the "Louisiana Action")), noting that "[i]f the Louisiana Preliminary Injunction's scope becomes limited or is overturned on appeal, North Dakota may bring its own motion for a preliminary injunction in this matter." *See* 2021 Lease Cancellation Challenge, ECF No. 38 at 9-10.

49.    Finally, the Court in the 2021 Lease Cancellation Challenge also held that North Dakota could not challenge quarterly lease sale cancellations that occurred after the filing of North Dakota's Complaint on July 7, 2022. *See* 2021 Lease Cancellation Challenge, ECF No. 56 at 4-5.

50.    This action is now brought in response to the Court's orders in the 2021 Lease Cancellation Challenge, and implicates the subsequently cancelled Q3 and Q4 2021 quarterly lease sales, and the subsequently cancelled Q1, Q3, and Q4 2022 quarterly lease sales.

**F.    North Dakota's Existing Challenge to BLM's Unlawful Cancellation of Oil and Gas Lease Auctions in North Dakota.**

51.    The Federal Defendants have cancelled and failed to hold quarterly lease sales in Q3 and Q4 of 2021, and Q1, Q3, and Q4 of 2022.

52.    A full listing of all 177 "available" tracts of land in North Dakota for which "expressions of interest" have been submitted, and the NEPA and SMA approval process has been completed and thus are "available for leasing" for these cancelled quarterly lease sales is attached as Exhibit 1 hereto. As is evident from this Exhibit 1, the Montana-Dakotas BLM Office has had

expressions of interest for available lands in North Dakota, in many instances, for multiple years, dating as far back as 2007.  Despite the longstanding availability of these parcels, the Montana-Dakotas BLM Office has failed to propose these available lands for a single quarterly lease sale before Q2 of 2023.   For many of the 177 available lands, the BLM State Office has also failed to even designate a proposed sale date, demonstrating that the Federal Defendants have no real plans to hold lease sales in North Dakota for these available lands.

53.    President Biden's Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, on January 27, 2021, stated that "to the extent consistent with applicable law, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters pending completion of a comprehensive review."  Fed. Reg. 7619 at § 206.

54.    Federal Defendants, acting in response to this Executive Order, "paused" new oil and gas leases, thus imposing a cancellation and moratorium of indeterminate length on future oil and gas leases.

55.    Indeed, only one quarterly lease sale has been held in North Dakota since the Executive Order was issued as of the time of this filing.  Eight lease sales should have been held during this timeframe.

56.    There are at least 177 tracts of land in North Dakota for which "expressions of interest" were submitted, nominated and are available for leasing.  These 177 federal tracts are subject to Communitization Agreements to which the Secretary is a party.

57.    The Federal Defendants have not provided the public, including the State of North Dakota or its citizens, with an opportunity to comment on the apparent cancellation quarterly lease sales in the State.

58.     Neither the Secretary or BLM have offered for public comment or scrutiny any explanation or analysis of the decision to impose a moratorium on oil and gas leases generally and the decision to the quarterly lease sales at issue in this action specifically.

59.     The closure of all federal mineral interests in North Dakota to oil and gas leasing is not provided for in the current North Dakota Resource Management Plan, which specifies that hundreds of thousands of acres are available for oil and gas leasing. *See* North Dakota Resource Management Plan and Environmental Impact Statement, Record of Decision (April 1988), available at https://eplanning.blm.gov/public_projects/lup/68341/101098/123142/rod.pdf.

60.     The North Resource Management Plan has not been amended to exclude oil and gas leasing in North Dakota, a process that must be completed before the BLM is entitled to make sweeping changes to its multi-use management policies in North Dakota.

61.     The decision to delay oil and gas leasing in a region for the purpose of conducting environmental studies constitutes a "withdrawal" under the FLPMA and is subject to its procedural requirements. *Mountain States Legal Foundation v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987). Federal Defendants have failed to comply with the procedural requirements necessary to "withdraw" lands from leasing under the FLPMA. *See, e.g.,* 43 U.S.C. §§ 1714 and 1739(e).

62.     Federal Defendants' moratorium on oil and gas leasing on federal lands is a significant change in federal land use policy and a major federal action, with the potential to "significantly affect[ ] the quality of the human environment," subject to the NEPA. *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.1(q)(3). NEPA requires Federal agencies to take a "hard look" at the environmental impacts of major federal actions and to prepare either an Environmental Assessment or an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C). In imposing their unlawful moratorium, Federal Defendants have failed to prepare either an Environmental

Assessment or an Environmental Impact Statement or to otherwise comply with, or even acknowledge, the requirements of NEPA, and have deprived the State of North Dakota and its citizens of their right and opportunity to participate in the NEPA review process.

**G. Impact of BLM's Unlawful Cancellation of Oil and Gas Lease Auctions on North Dakota.**

63.    The cancellation of the Q3 and Q4 2021 quarterly lease sales, and the Q1, Q3, and Q4 2022 quarterly lease sales imposes significant and material adverse effects on North Dakota that will only continue to grow as the unlawful moratorium continues.

64.    The effects of the unlawful lease cancellation are amplified by the unique split-estate makeup of mineral interests in North Dakota.  In looking at the cancelled quarterly lease sales when compared to "available" lands, North Dakota has calculated that the failure to conduct lease sales will result in delaying the development of 26,690 federal, 4,580 state, and 21,880 private mineral acres $1.08 billion in revenue or $9.0 million per month at Net Present Value 10[2] for every month development is delayed.  Of the $9.0 million per month approximately 30% is earmarked for education, 10% for natural resource (water) projects, 10% for Health and Human Services (Aging Services, Behavioral Health, Child Support & Family Services, Developmental Disability Services, and State Hospital), 7% to counties and 7% to cities, 5% to statewide infrastructure, 30 % to legacy fund for education, resources, and human services support of future generations, and 1% other.

65.    These damages illustrate how Federal Defendants' unlawful moratorium "leverages" the split estate and pooling arrangements characteristic of North Dakota to also

---

[2] Net Present Value is the value of all future cash flows (positive and negative) over the entire life of an investment discounted to the present.  In this instance it represents the loss of revenue to North Dakota over the next 10 years.

unlawfully exercise jurisdiction over and cause damage to State and private mineral interests.  In the nine tracts shut down by the unlawful cancellation of the March and June auctions, the State and private mineral interests blocked by Federal Defendants' unlawful moratorium are more than twice the size of the federal interests.  For the 177 tracts ready for lease now and over the next twelve months, the federal mineral interests subject to the unlawful moratorium are holding "hostage" a much larger amount of State and private mineral interests.

66.    These adverse impacts will only increase as the delay in lease sales persists.  In addition to the cumulative effect of lost revenue, persistent uncertainty will depress capital investment and have a rippling effect on related business activity.  Given the typical cycle of oil and gas development, linked to the up and down-market rhythm of oil prices, cancellations that delay the development of mineral interests can permanently damage and even completely eliminate the economic value of tracts.

67.    The damages caused by Federal Defendants' unlawful blocking of oil and gas development on State and private lands are in addition to the hundreds of millions of dollars in lost royalties from Federal Defendants' unlawful moratorium on the leasing of federal mineral interests.

68.    In addition to the significant economic damages to North Dakota and its citizens caused by the Federal Defendants' unlawful moratorium, their actions also interfere with and damage North Dakota's sovereign rights and authority to regulate, manage and develop the State's natural resources, including those owned by either State or private interests, in a responsible manner that takes into account the interests of all of its citizens and the long-term protection of the environment and the State's natural resources.  *See* N.D. CENT. CODE § 54-17.5-01 (the North Dakota legislature declaring it to be an essential government function and public purpose to

"foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste.").

### COUNT I: MINERAL LEASING ACT – VIOLATION OF STATUTORY DUTY

69.    North Dakota reasserts and incorporates by reference all preceding paragraphs.

70.    Federal Defendants violated the MLA by cancelling and failing to hold the 2021 quarterly lease sales and the Q1, Q3, and Q4 2022 quarterly lease sales.

71.    The MLA provides that "[l]ease sales shall be held for each State where eligible lands are available at least quarterly and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(emphasis added).

72.    BLM's regulations further provide that "Each proper BLM Sate office shall hold sales at least quarterly if lands are available for competitive leasing." 43 C.F.R. § 3120.1-2(a). *See also*, BLM Manual, Section 2120 Competitive Leases, available at https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual3120.pdf; United States Department of the Interior and Bureau of Land Management, Updating Oil and Gas Leasing Reform - Land Use Planning and Lease Parcel Reviews, Instruction Memorandum No. 2018-034 (January 31, 2018), available at https://www.blm.gov/policy/im-2018-034 ("State/field offices are required, by statute (MLA, 30 U.S.C. § 226(b) (1) (A)), and implementing regulation (43 CFR 3120.1-2(a)), to hold quarterly lease sales, when eligible lands are available for lease.  Lease sales should occur in the last month of each calendar year quarter.").

73.    "Both the MLA and the associated regulations provide for quarterly lease sales." *W. Energy Alliance v. Zinke*, 877 F.3d 1157, 1161 (10th Cir. 2017).  "Under both the MLA and BLM's Leasing Reform Policy, quarterly lease sales are mandated *unless* no eligible parcels of

land are available." *W. Energy All. v. Jewell*, Civil No. 1:16-CV-00912-WJ-KBM, at *13 (D.N.M. Jan. 13, 2017) (emphasis in original).

74.     BLM's regulations provide that "Lands included in any expression of interest" are "available for leasing." 43 C.F.R. § 3120.1-1(e). BLM's regulations require that "[a]ll lands available for leasing shall be offered for competitive leasing." 43 C.F.R. § 3120.1-1.

75.     There are currently federal lands available for leasing in North Dakota.

76.     Despite the availability of lands for leasing throughout 2021 and 2022, only one quarterly lease sale was held.  No preparations have been made to date for any 2023 quarterly lease sales.  *See* 43 C.F.R. § 3120.4-2 (detailing actions to be taken by BLM in advance of lease sales).

77.     BLM has a mandatory duty under the MLA and its implementing regulations to conduct quarterly lease sales.

78.     BLM has violated that mandatory duty by taking the final agency action to cancel the 2021 and 2022 quarterly lease sales.

79.     On information and belief, BLM intends to further violate that mandatory duty by cancelling quarterly lease sales in March of 2023 and subsequent quarters.

80.     Cancelling these sales has caused harm to North Dakota and will continue to cause harm to North Dakota.

81.     North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with law, its regulations and customary practice.

82.     North Dakota is entitled to a declaratory judgment stating that cancelling quarterly lease sales is unlawful under the MLA.

**COUNT II: MINERAL LEASING ACT – EXCEEDING STATUTORY JURISDICTION**

83.     North Dakota reasserts and incorporates by reference all preceding paragraphs.

84.     Federal Defendants' unlawful cancellation of oil and gas lease sales in violation of their mandatory duties under the MLA has blocked the development of significant State and private mineral interests more than twice the size of the embargoed federal mineral interests.

85.     Through their violation of their mandatory duties under the MLA, Federal Defendants have unlawfully, unilaterally and arbitrarily exercised veto power over the development of State and private mineral interests, exceeding Federal Defendants' statutory jurisdiction under the MLA.

86.     By blocking the development of the State and private mineral interests, the unilateral actions of the Federal Defendants have deprived North Dakota of its ability to regulate such development, effectively exercising an unlawful federal veto over North Dakota's authority to regulate State and privately-owned natural resources in the State.

87.     On information and belief, Federal Defendants intend to further violate their mandatory duties under the MLA into the foreseeable future, and thus will continue to unlawfully, unilaterally and arbitrarily block the development of significant State and private mineral interests in North Dakota in excess of Federal Defendants' statutory jurisdiction under the MLA.

88.     Federal Defendants' unlawful exercise of jurisdiction over State and private mineral interests has caused harm to North Dakota and will continue to cause harm to North Dakota.

89.     North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with law, its regulations and customary practice, and to cease the unlawful exercise of jurisdiction over State and private mineral interests.

90.    North Dakota is entitled to a declaratory judgment stating that cancelling quarterly lease sales and exercising veto power over the development of State and private mineral interests is unlawful under the MLA.

### COUNT III: FEDERAL LAND POLICY AND MANAGEMENT ACT – RESOURCE MANAGEMENT PLANS

91.    North Dakota reasserts and incorporates by reference all preceding paragraphs.

92.    "For nearly 30 years, BLM's management of public lands has been governed by the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U. S. C. § 1701 *et seq*." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004). "To these ends, FLPMA establishes a dual regime of inventory and planning." *Id*.; *see also* 43 U.S.C. § 1732(a).

93.    Federal Defendants have not followed this statutorily mandated process by suddenly, unilaterally, arbitrarily and without any apparent process or explanation cancelling all lease sales in North Dakota and nationwide.

94.    The Department of the Interior manages the use of federal oil and gas resources through a three-phase decision-making process. *Pennaco Energy v. U.S. Dept. of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). First, BLM establishes a resource management plan for the region, which itself involved an extensive planning process. Second, BLM conducts lease sales under the MLA. Third, BLM considers applications for permission to drill.

95.    "[T]he main tool that BLM employs to balance wilderness protection against other uses is a land use plan — what BLM regulations call a 'resource management plan.'" *Norton v. S.U.W.A.*, 542 U.S.at 59, citing 43 CFR § 1601.0-5(k). "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." *Id*. "The Secretary shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans developed by him under section 1712 of this title when

they are available." 43 U.S.C. § 1732(a).  "All future resource management authorizations and actions, as well as budget or other action proposals to higher levels in the Bureau of Land Management and Department, and subsequent more detailed or specific planning, shall conform to the approved plan."  43 C.F.R. §§ 1610.5-3(a).

96.    "The resource management plans establish which areas within the Field Office's boundaries are open to oil and gas leasing and which areas are closed."  *W. Energy All. v. Jewell*, Civil No. 1:16-CV-00912-WJ-KBM, at *2 (D.N.M. Jan. 13, 2017).  "If a resource management plan authorizes oil and gas development on certain land parcels, BLM must sell leases for those parcels on a quarterly basis." *WildEarth Guardians v. Bernhardt*, --- F. Supp. 3d ---, 2020 WL 6701317, at *3 (D.D.C. Nov. 13, 2020) (citing 30 U.S.C. § 226(b)(1)(A); 43 C.F.R. § 3120.1-2).

97.    Until amended through a formal planning process, the Resource Management Plan is binding on the BLM.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004); 43 C.F.R. § 1610.5–5.

98.    The current North Dakota Resource Management Plan includes the regular and statutorily mandated quarterly auction of mineral leases.  Federal Defendants did not amend the North Dakota Resource Management Plan to allow the suspension of the quarterly lease auctions mandated by statute.  Therefore, closure of North Dakota to new federal oil and gas leases violated and continues to violate the North Dakota Resource Management Plan and also violates the FLPMA.

99.    The closure of North Dakota to new federal oil and gas leases in violation of the FLPMA and the North Dakota Resource Management Plan has caused and continues to cause damage to North Dakota.

100.    North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with the FLPMA and the North Dakota Resource Management Plan.

101.    North Dakota is entitled to a declaratory judgment stating that cancelling quarterly lease sales is unlawful under the FLPMA.

**COUNT IV: FEDERAL LAND POLICY AND MANAGEMENT ACT – WITHDRAWAL**

102.    North Dakota reasserts and incorporates by reference all preceding paragraphs.

103.    Federal Defendants' action violated FLPMA by unlawfully withdrawing the public domain in North Dakota, and the nation, from federal oil and gas leasing.

104.    Federal Defendants' action qualifies as a "withdrawal" under FLPMA.  *See* 43 U.S.C. § 1702(j) ("The term 'withdrawal' means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; or transferring jurisdiction over an area of Federal land.")

105.    The decision to halt federal oil and gas leasing in North Dakota for the alleged purpose of conducting environmental studies constitutes a "withdrawal" under the FLPMA and is subject to its procedural requirements.  *Mountain States Legal Foundation v. Hodel*, 668 F. Supp. 1466, 1474 (D. Wyo. 1987)

106.    Federal Defendants' withdrawal did not comply with the procedural requirements of FLPMA.  *See, e.g.,* 43 U.S.C. §§ 1714 and 1739(e).

107.    This withdrawal has caused and continues to cause damage to North Dakota.

108.    North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with the FLPMA, its regulations and customary practice.

109.    North Dakota is entitled to a declaratory judgment stating that cancelling quarterly lease sales is unlawful under the FLPMA.

### COUNT V: NATIONAL ENVIRONMENTAL POLICY ACT

110.    North Dakota reasserts and incorporates by reference all preceding paragraphs.

111.    Federal Defendants' actions violated NEPA by failing to assess the environmental impacts of the Federal Defendants' action before suspending all federal oil and gas lease sales in North Dakota.

112.    A moratorium on oil and gas leasing on federal lands in North Dakota, and the nation, is a significant change in federal land use policy and a major federal action, with the potential to "significantly affect[s] the quality of the human environment."  *See* 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.1(q)(3).

113.    NEPA requires Federal agencies to take a "hard look" at the environmental impacts of major federal actions and to prepare either an Environmental Assessment or and Environmental Impact Statement.  42 U.S.C. § 4332(2)(C).

114.    A NEPA review would force Federal Defendants to take a hard look at potential environmental costs of this policy, such as increased reliance on foreign energy sources, a shift in new production to regions with fewer environmental and workplace safety regulations, and increased oil tanker traffic.  NEPA does not exempt actions taken with a putative environmental purpose.

115.    Federal Defendants' decision to suspend federal oil and gas leasing in North Dakota without first complying with the obligations of NEPA and preparing an Environmental Assessment and, potentially, and Environmental Impact Statement is unlawful.

116.    North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with law, its regulations and customary practice, including requiring BLM to comply with its obligations under NEPA.

117.    North Dakota is entitled to a Declaratory Judgment stating that cancelling quarterly lease sales is unlawful due to the failure to comply with NEPA.

**COUNT VI: ADMINISTRATIVE PROCEDURE ACT**

118.    North Dakota reasserts and incorporates by reference all preceding paragraphs.

119.    The APA requires courts to hold unlawful and set aside agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

120.    Additionally, the APA requires courts to hold unlawful and set aside agency actions found to be in excess of statutory jurisdiction, authority, or limitation, or short of statutory right. *Id.* § 706(2)(C).

121.    Federal Defendants' cancellation of the quarterly lease sales in 2021 and 2022 were a final agency actions because BLM decided to not conduct a mandatory statutory duty in compliance with a statutory deadline. *See Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004).

122.    Federal Defendants decision to indefinitely cancel all oil and gas leasing in North Dakota was also a final agency action because the FLPMA imposes specific procedural requirements that must be followed before the North Dakota Resource Management Plan may be

amended or land withdrawn from oil and gas leasing, and the decision to not offer duly nominated tracts for oil and gas leasing constitutes a "withdrawal" as defined in the FLPMA.

123.    When an agency has not stated any reasons to support a decision, its decision is arbitrary and capricious for failure to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Manufacturers Assoc. of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

124.    Federal Defendants' cancellation of pending lease sales and imposition of a moratorium on future lease sales was arbitrary and capricious because Federal Defendants failed to provide any reasoning for their decision.  The sudden imposition of a major policy reversing the federal oil and gas leasing program in North Dakota and decades of leasing policy required an explanation.  Because Federal Defendants departed from prior policy without an explanation for the major new policy, this Court may set aside this action, and inaction, as arbitrary and capricious.

125.    The Federal Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

126.    The Federal Defendants' actions failed to observe procedures required by law.  5 U.S.C. § 706(2)(D).  Federal Defendants failed to comply with both the basic notice and comment procedures laid out in the APA and with the more specific procedures required by the FLPMA, NEPA and other statutes.

127.    The Secretary unlawfully withheld agency action.  5 U.S.C. § 706(1).

128.    North Dakota is entitled to an injunction prohibiting BLM from cancelling, and requiring BLM to conduct, quarterly lease sales in accordance with law, its regulations and customary practice because the arbitrary and unilateral cancellation and moratorium violated the APA under 5 U.S.C. 706(1) and 5 U.S.C. § 705.

129.    For these and other reasons that will be more fully detailed in the State of North Dakota's merits briefs, Federal Defendants must conduct mandatory lease sales in accordance with law and any contrary policy or action must be set aside.

WHEREFORE the State of North Dakota respectfully requests that this Court:

A.    Issue a Declaratory Judgement stating that Federal Defendants are in violation of the MLA, FLPMA, NEPA, and the APA;

B.    Compel Federal Defendants to hold previously unlawfully cancelled quarterly lease sales including the Q1, Q2, Q3, and Q4 2021 quarterly lease sales, and the Q1, Q3, and Q4 2022 quarterly lease sales in North Dakota;

C.    Prohibit Federal Defendants from cancelling, and compel Federal Defendants to conduct, quarterly lease sales in North Dakota in accordance with the MLA and FLPMA and the North Dakota Resource Management Plan;

D.    Enter other preliminary or permanent injunctive relief as the State of North Dakota may hereafter specifically seek; and grant the State of North Dakota such additional relief as the Court deems just and proper to remedy the Secretary's violations of law and to protect the State of North Dakota's sovereign interests.

Dated:  January 5, 2023

DREW H. WRIGLEY
ATTORNEY GENERAL
STATE OF NORTH DAKOTA

/s/ *Paul M. Seby*
Paul M. Seby
Special Assistant Attorney General
Greenberg Traurig, LLP
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

Matthew Sagsveen
Assistant Attorney General
Director of Natural Resources and Indian
Affairs
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505
Phone: (701) 328-2595
Email: masagsve@nd.gov

COUNSEL FOR PLAINTIFF
STATE OF NORTH DAKOTA