### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NORTH DAKOTA
### WESTERN DIVISION

| | | |
|---|---|---|
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 1:23-cv-00004 |
| | ) | |
| THE UNITED STATES DEPARTMENT OF | ) | |
| INTERIOR; *et al.*, | ) | |
| | ) | |
| Defendants. | | |

---

### MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

---

### INTRODUCTION

The State of North Dakota ("State" or "North Dakota") submits this Memorandum in Support of its Motion for Preliminary Injunction ("Motion"). The Federal Defendants have unlawfully cancelled all but one of the eight quarterly federal oil and gas lease sales in North Dakota in 2021 and 2022 that were required by the federal Mineral Leasing Act ("MLA"). These unlawful cancellations are causing irreparable harm to North Dakota, impairing North Dakota's sovereign right and obligations to develop and regulate thousands of acres of private and state mineral resources that are communitized with federal mineral interests and blocked from development when the leasing of those federal interests is unlawfully cancelled. North Dakota is also suffering irreparable harm and injury through the loss of the royalties and bonuses in excess of one billion dollars that would be generated, and the associated services to its citizens that would be provided, but for the quarterly lease sales being cancelled.

Over a year ago, North Dakota filed a complaint in this Court challenging the Federal Defendants' cancellation of the Q1 and Q2 2021 quarterly lease sales. *See State of North Dakota*

*v. United States Department of Interior, et al.* 1:21-cv-00148 (D. N.D.) (the "2021 Litigation"), ECF No. 1.   In this litigation, which is still pending, the Court denied North Dakota's Motion for Writ of Mandamus, noting that the Federal Defendants gave "assurances at the [January 12, 2022] hearing the process to start Federal oil and gas leasing sales in North Dakota was imminent" but that "[i]f the Defendants do not hold to their word and cancel any planned future sale, North Dakota may bring this action for review of the specifically cancelled sales" (*see id*, ECF No. 38 at 9). The Court also declined to enforce the nationwide preliminary injunction issued by the U.S. District Court for the Western District of Louisiana in North Dakota due to its nationwide scope (*see State of Louisiana et al. v. Joseph R. Biden, Jr., et al.*, 2:21-cv-00778 (W.D. La. June 15, 2021) (the "Louisiana Action")), noting that "[i]f the Louisiana Preliminary Injunction's scope becomes limited or is overturned on appeal, North Dakota may bring its own motion for a preliminary injunction in this matter" (*see* 2021 Litigation, ECF No. 38 at 9-10).

Since then, several events anticipated by this Court's Order have now transpired, thus leading to the instant litigation.   First, the nationwide preliminary injunction entered in the Louisiana Action has since been modified to be a permanent injunction against the Federal Defendants, enjoining them from implementing any cancellation of quarterly lease sales for eligible lands. *See* Louisiana Action, ECF No. 219 at 42-43.   The scope of that permanent injunction is limited to the plaintiff states in that action, which do not include North Dakota. *See id.*  This development should remove any concerns the Court may have had regarding interfering with permanent injunction issued in the Louisiana Action, as North Dakota's interests are no longer protected by the Louisiana Action.   Second, despite their assurances to the Court in the 2021 Litigation, the Federal Defendants have since only held a single quarterly lease sale (in Q2 of 2022) and have cancelled all other federal quarterly lease sales in North Dakota.   Third, in the

2

2021 Litigation the Court held that North Dakota could not include challenges to quarterly lease sale cancellations that occurred after North Dakota filed its Complaint on July 7, 2021.  *See* 2021 Litigation, ECF No. 56 at 4-5.  Fourth, merits briefing in the 2021 Litigation was stayed for sixty days on November 8, 2022 "so that [North Dakota] may the evaluate its path forward given [Federal] Defendants' cancellation of lease sales subsequent to the initiation of this action and the alteration of the preliminary injunction in the Louisiana Action."  *See* 2021 Litigation at ECF No. 59, Order Granting Unopposed Motion for Stay of Case Deadlines.  Finally, further removing any ambiguity behind the Defendant's policy and intentions, President Joe Biden recently stated that there would be "No more Drilling.  There is no more Drilling.  I haven't formed any new drilling." William Allison, *President Biden Says The Quiet Part Out Loud In New York: "No More Drilling",* ENERGYINDEPTH (November 7, 2022) (https://www.energyindepth.org/president-biden-says-the-quiet-part-out-loud-in-new-york-no-more-drilling/).

North Dakota is likely to prevail on the merits of its claims.  First, the Federal Defendants have violated their statutory duties to hold quarterly lease sales under the MLA because federal lands in North Dakota are "available" and ready for leasing, and have been since the Federal Defendants' cancellations of quarterly sales began in Q1 of 2021.  Second, the Federal Defendants have violated the Federal Land Policy and Management Act ("FLPMA") by ignoring existing Resource Management Plans ("RMPs") in North Dakota that declare the set of federal lands eligible for leasing, thus unlawfully withdrawing lands from the public domain and thus unlawfully modifying the RMPs without providing North Dakota the statutorily granted right to comment on proposed withdrawals.  The Federal Defendants previously offered excuses for failing to hold the statutorily mandated quarterly lease sales – the need to complete a comprehensive review of the leasing program pursuant to Executive Order 14008 and the need to rework National

Environmental Policy Act ("NEPA") environmental reviews – cannot override the statutory mandate of the MLA to hold quarterly lease sales. *See ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988).

The Federal Defendants' unlawful actions have and continue to cause irreparable harm to North Dakota by interfering with the State's sovereign rights and obligations to manage the State's natural resources.  This harm is amplified due to the unique nature of the "split estate" structure and management of mineral rights in North Dakota, whereby State and private mineral interests are pooled with federal interests, and therefore cannot be developed when the Federal Defendants unlawfully refuse to lease the federal mineral interests therein.  This unlawful interference with North Dakota's sovereign rights and obligation also threatens to deprive North Dakota of $1.08 billion in revenue over the next 10 years (approximately $9.0 million per month), monies which support critical State programs and infrastructure.

Further, the balance of equities and the public interest weigh in favor of granting this Motion.  North Dakota has a vested interest in is sovereign right to manage and regulate the development of state and private minerals, and the revenues that fund programs that protect and benefit its citizens, that are being blocked by the Federal Defendants' unlawful lease cancellations. Contrastingly, the preliminary injunction will create only a slight inconvenience to the Federal Defendants' who would be required to hold statutorily mandated quarterly lease sales in North Dakota in accordance with law – something they are already bound to do and can do while they separately revisit their environmental analyses for future quarterly lease sales.

North Dakota's Motion for Preliminary Injunction should be granted.  The Federal Defendants' unlawful cancellation of quarterly lease sales in 2021 and 2022 should be declared unlawful, and the Federal Defendants should be enjoined from cancelling any further quarterly

lease sales and ordered to conduct quarterly lease sales for lands available for leasing under the MLA.

**ARGUMENT**

The Federal district courts have broad discretion in ruling on requests for preliminary injunctions. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 n. 8 (8th Cir. 1981) (en banc). Four Factors must be considered: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 44 (8th Cir. 2003) (citing *Dataphase Sys., Inc..*, 640 F.2d at 114). Here all four factors favor North Dakota.

I. **North Dakota Has Standing To Challenge The Federal Defendants Cancellation Of Seven Quarterly Lease Sales And The Attendant Withdrawal Of Federal Lands From Eligibility For Leasing.**

North Dakota has standing to challenge the Federal Defendants cancellation of quarterly lease sales because it is suffering "concrete and particularized injur[ies]" that are both "actual or imminent", are "fairly traceable to the [Federal D]efendant[s]", and "it is likely that a favorable decision will redress th[ose] injur[ies]. *See Massachusetts v. EPA,* 549 U.S. 497, 517 (2007); *see also Kuehl v. Sellner,* 887 F.3d 845, 850 (8th Cir. 2018).

First, the Federal Defendants cancellation of quarterly lease sales have injured North Dakota through the loss of its sovereign rights to develop private and State lands, and the loss of revenues that would have funded citizens services had the quarterly lease sales been held. Declaration of L. Helms, Exhibit 1 hereto at ¶¶ 33-48.

Second, the quarterly lease sale cancellations violate the Federal Defendants' mandatory statutory duties under the MLA and FLPMA, and North Dakota's injuries would not occur but for

5

those violations.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (noting Congress is well positioned to identify intangible harms through defining injuries via statutory rights); *see id.* at 342 (2016) (explaining that "the violation of a procedural right granted by statute" can constitute the injury in fact required for a plaintiff to establish standing).

Third, the Court can provide relief redressing North Dakota's irreparable harms.  The Administrative Procedure Act ("APA") provides that the reviewing court shall compel agency action unlawfully withheld or unreasonably delayed (5 U.S.C. 706(1)), and allows Courts to hold unlawful and set aside agency actions that are not in accordance with law or without observance of the procedures required by law (*id.* at 706(2).  Further, the APA, 5 U.S.C. § 705,[1] and Fed. R. Civ. P. 65(a)[2] empower this Court to enjoin the administrative actions and inactions at issue in this case.  The Supreme Court has held that a "failure to act" includes failure to take one of the agency actions defined in 5 U.S.C. § 551(13).  *Norton*, 542 U.S. at 62-63 (Noting that a failure to act includes, "for example, the failure to promulgate a rule or **take some decision by a statutory deadline**." (emphasis added)).

The Federal Defendants cancellation of each statutorily mandated quarterly lease sale challenged herein are final agency actions because the decision resulted in "direct and immediate" impacts.  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967).[3]  This Court can redress

---

[1] 5 U.S.C. § 705 states that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  *See also  Winkler v. Andrus,* 614 F.2d 707, 709 (10th Cir. 1980) ; *see also Cook Cty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).
[2] North Dakota requests that no injunctive bond or surety be required under Fed. R. Civ. P. 65(c). As discussed below, the harm to the Federal Defendants from a preliminary injunction is *de minimis* because the Federal Defendants have violated the procedural requirements of the MLA and FLPMA. This court has discretion to determine whether a bond is necessary. *Stockslager v. Carroll Elec. Cooperative Corp.,* 528 F.2d 949 (8th Cir. 1976).
[3] *See also* Louisiana Action, ECF No. 219 at 28-31 (concluding that the cancellation of each quarterly lease sale is a final agency action and not a programmatic challenge).

North Dakota's injuries with injunctive relief or a ruling on the merits setting aside the Federal Defendants' unlawful cancellations. *See Nat. Res. Def. Council, Inc. v. Hodel,* 865 F.2d 288 (D.C. Cir. 1988), (portions of the Five-Year Plan under the offshore leasing act could be reviewed so a decision to "Pause" the 5-year plan should also be able to be reviewed.)*; U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 51 S. Ct. 502, 75 L. Ed. 1148 (1931) (the temporary withdrawal of public lands by the Secretary of the DOI was found to be a final agency action);

II.    **North Dakota Is Suffering Irreparable Sovereign And Economic Harms.**

   A.  **The United States Constitution and the MLA recognize North Dakota's sovereign right to develop and regulate state and private minerals.**

North Dakota has always retained the sovereign right to regulate the development of state and private oil and gas interests.  In 1953, the North Dakota State Legislature established the statutory sovereign duties of North Dakota:

> **to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste**; to authorize and to provide for the operation and development of oil and gas properties in such a manner **that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected**; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations **in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources**.

N.D. CENT. CODE § 38-08-01 (emphasis added).

The Tenth Amendment to the United States Constitution encompasses North Dakota's sovereign right to develop and regulate state and private mineral interest: "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. CONST., Amend. X.  North Dakota unquestionably "retain[s] a significant measure of sovereign authority . . . to the extent the Constitution has not divested [North Dakota of] original

powers." *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 549 (1985).  Under North Dakota's sovereign authority, "regulation of land use is perhaps the quintessential state activity." *FERC v. Mississippi*, 456 U.S. 742, 768 n.30 (1982); *accord City of Edmonds v. Oxford House*, 514 U.S. 725, 744 (1995) ("land-use regulation is one of the historic powers of the States"); *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159, 174 (2001) ("States have a constitutional right to maintain their "traditional and primary power over land and water use."); *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (Supreme Court recognizing that States have "sovereign interests" in "the exercise of sovereign power over individuals and entities within [their] jurisdiction" including "the power to create and enforce a legal code").  *Hess v. Port Authority TransHudson Corp.,* 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments").

The MLA also explicitly recognizes that the States retain their sovereign right to manage lands and mineral resources, stating that that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have." 30 U.S.C. § 189; *see also* 30 U.S.C. § 187 (No leases issued by the Secretary of the Interior "shall be in conflict with the laws of the State in which the leased property is situated.").  It is this sovereign duty that is irreparably damaged by the Federal Defendants unlawful cancellations of federal quarterly lease sales in North Dakota, which interferes with North Dakota's sovereign rights and obligation to develop and regulate State and private oil and gas resources that are pooled with federal oil and gas interests.

    **B.  The Federal Defendants quarterly lease sale cancellations unlawfully block North Dakota's sovereign right to develop and regulate state and private minerals, causing irreparable harm.**

"[M]ineral deposits don't always follow plat lines," *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. Aug. 14, 2014), such that federal, state, and private mineral interests frequently overlap in a given development area, commonly known as a "split estate."[4] The uncoordinated development of mineral resources in split estates "often yielded frantic, duplicative, and crazy-quilt exploration activities in what amounted to a single oil and gas field." *Id.*

To avoid waste and encroachment of mineral development in these split estates, the MLA authorizes federal, state, and private owners to enter into cooperative management units, known as "Communitization Agreements", governing the efficient development split estate mineral interests.  *See* 30 U.S.C. § 226(m) ("For the purpose of more properly conserving the natural resources of any oil or gas pool . . . lessees thereof and their representatives may unite with each other . . . in collectively adopting and operating under a cooperative or unit plan of development."). Importantly, this authority is limited, and requires the "consent of the holders of leases involved." *Id.*.  Further, the MLA's authorization of Communitization Agreements explicitly recognizes that States and private actors retain their sovereign rights for mineral management.  *See* 30 U.S.C. § 184a (Providing that "nothing in this section . . . shall be construed as in any respect waiving, determining or affecting any right, title, or interest, which otherwise may exist in the United States, and that the making of any agreement, as provided in this section, shall not be construed as an admission as to the title or ownership of the lands included."); 30 U.S.C. § 189 (stating that that "[n]othing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have."); *see also* 30 U.S.C. § 187 (No leases issued

---

[4] *See* Declaration of L. Helms at ¶¶ 7-22 (describing the split estate structure in North Dakota, and noting that North Dakota is unique in that it has substantially more state and private lands subject to split estates than most other states in the United States).

by the Secretary of the Interior "shall be in conflict with the laws of the State in which the leased property is situated.").

Seeing the value of Communitization Agreements, North Dakota enacted statutes authorizing communitization of state and private minerals with federal minerals. *See* N.D. CENT. CODE §§ 38-08-07, 38-08-08.  North Dakota law establishes rules by which the various mineral interests involved in communitization arrangements share both the costs and benefits of a cooperative approach to developing the pooled or unitized oil and gas interests.  *See*, N.D. CENT. CODE Chapter 38-08.  Oil and gas development and production in North Dakota is generally managed in terms of "spacing units," which are typically 1280 acres in size (one mile by two miles).

Due to the split estate context, federal mineral interests impinge on over 30% of the spacing units in the State, creating a checkerboard of lands with private or state surface ownership and a mix of federal, state, and private mineral ownership.  Declaration of L. Helms at ¶ 9.  Because federal interests impinge on such a significant number of its spacing units, North Dakota has entered into Communitization Agreements with the Federal Defendants.  *Id.* at ¶¶ 13-19 (citing to N.D. CENT. CODE §§ 38-08-07, 38-08-08 (requiring North Dakota to pool or communitized split estate mineral interests with federal mineral interests); N.D. CENT. CODE § 38-08-01 (the North Dakota legislature declaring it to be an essential government function and public purpose to "foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste.").

The Federal Defendants refusal to hold the statutorily mandated quarterly lease sales creates a massive problem for North Dakota: if the federal mineral interests within a spacing unit subject to a Communitization Agreement are not leased, the Federal Defendants *will not allow the*

*development of many of the private and state mineral interests in that spacing unit*.  Declaration of L. Helms at ¶ 16 (citing to BLM IM 2020-028; 43 CFR § 9230; BLM Manual 3160-2 and 3160-9).  This is true even when the federal mineral interest in the pooled spacing units is *de minimis*.  That is because under the Federal Defendants' Communitization Agreements, the presumption is that the development of the State or private interests will adversely affect the federal mineral interests.  *See*, 43 CFR 3105, 25 CFR Parts 211 and 212, BLM Manual 3160-9.   Thus, if the federal mineral interests that are part of a pooled spacing unit and subject to a Communitization Agreement are not leased, the Federal Defendants will not approve the exploration and production of oil and gas from many of the pooled State or private mineral interests.  Declaration of L. Helms at ¶ 16.

North Dakota is thus suffering irreparable harm and injury through the loss of its sovereign right to regulate and develop private and state minerals that have been pooled with federal minerals under Communitization Agreements because the Federal Defendants are unlawfully refusing to conduct quarterly lease sales of those federal mineral interests.  *See State of Kansas v. U.S.*, 249 F.3d 1213 (10th Cir. 2001) (In deciding a motion for preliminary injunction, holding that because an agency's final action "places [plaintiff's] sovereign interests and public policies at stake, we deem the harm the State stands to suffer as irreparable.").

North Dakota has calculated that the Federal Defendants' cancellation of and failure to conduct lease sales will result in delaying the development of 26,690 federal, 4,580 state, and 21,880 mineral acres.  Declaration of L. Helms at ¶ 37.  This has blocked the development of several of federal, state, and private parcels that have been identified as critical to North Dakota's 2022 and 2023 development plans.  *Id.* at ¶ 43-48.  This is a substantial impairment on North

Dakota's sovereign right to develop state resources and its sovereign right and duty to develop the state and private mineral resources without waste.

### C. North Dakota is suffering irreparable economic harm from the loss of revenues that would be generated by the statutorily mandated quarterly lease sales.

North Dakota is also suffering irreparable harm due to the loss of the royalties and bonuses that would be generated by the quarterly lease sales that have been unlawfully cancelled. The MLA provides that for oil and natural gas leases on federal lands, 50 percent of bonuses, production royalties, and other revenues are granted to North Dakota, and 40 percent is granted to the Reclamation Fund, which maintains agricultural irrigation systems in several Western States, including North Dakota. *See* 30 U.S.C. §191(a). In addition, the development of State and private mineral interests generates significant revenue for the State. The Federal Defendants' cancellation of quarterly lease sales (and the associated blocked development of the substantial state and private acreage) will cost North Dakota approximately $1.08 billion in lost revenue over the next ten years, or $9.0 million per month at Net Present Value $10^5$ for every month development is delayed. Declaration of L. Helms at ¶ 37. This revenue loss translates directly into irreplaceable losses of vital services to the citizens of North Dakota. Of the $9.0 million per month in estimated lost revenue, approximately 30% is earmarked for education, 10% for natural resource (water) projects, 10% for health and human services (aging services, behavioral health, child support & family services, developmental disability services, and the state hospital), 7% to counties and 7% to cities, 5% to statewide infrastructure, 30 % to North Dakota's Legacy Fund for education, resources, and human services support of future generations, and 1% other. *Id*. (*see also* Attachment B to

---

[5] Net Present Value is the value of all future cash flows (positive and negative) over the entire life of an investment discounted to the present. In this instance it represents the loss of revenue to North Dakota over the next 10 years.

Declaration of L. Helms).  The cancelled lease sales also represent a loss of 584 full time long term upstream industry jobs based upon the most recent study of the economic impacts of North Dakota's oil and gas industry and confirmed by the job losses that occurred during the COVID pandemic.  *Id.* at ¶ 38.

North Dakota cannot seek money damages from the Federal Defendants in this case.  5 U.S.C. § 702; *see also Lane v. Pena*, 518 U.S. 187, 196 (1996).  As a result, the economic damages that North Dakota is suffering from the loss of royalties and bonuses from blocked production are not recoverable and are irreparable.  *Iowa Utilities Board v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) (The "threat of unrecoverable economic loss" qualifies as irreparable harm.); accord *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.* 715 F.3d 1268, 1289 (11th Cir. 2013); *Crowe & Dunlevy, P.C., v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011)).  Further, these unrecoverable and irreparable economic losses translate directly into lost and unrecoverable services to North Dakota's citizens, including to schools and the protection of natural resources.

> **D. North Dakota is suffering irreparable harm from the loss of the ability to participate in the public notice and comment process required prior to the withdrawal of lands from the RMPs under FLPMA.**

The Federal Defendants have also deprived North Dakota of its right to participate in the public notice and comment process required by FLPMA, as set forth in Section III.B, *infra*.  *See Spokeo*, 578 U.S. at 342 (explaining that "the violation of a procedural right granted by statute" can constitute the injury in fact required for a plaintiff to establish standing).  Had the Federal Defendants formally provided public notice of the reasons for cancelling the 2021 and 2022 quarterly lease sales, North Dakota could and would have participated in that process and challenged the cancellations.  Instead, the Federal Defendants are operating behind a curtain,

quietly and unlawfully cancelling quarterly lease sales indefinitely, and seeking to avoid any judicial review of the process.

### III. North Dakota Is Likely To Succeed On The Merits of Its Claims.

#### A. The Federal Defendants are violating the MLA's mandatory requirement to hold quarterly lease sales.

##### i. The MLA mandates that lease sales are held quarterly where lands are available.

The MLA was amended in 1987 and requires that oil and gas "[l]ease sales **shall** be held for each State where eligible lands are available **at least quarterly** and more frequently if the Secretary of the Interior determines such sales are necessary." 30 U.S.C. § 226(b)(1)(A) (emphasis added). BLM's own regulations also reiterate the statutory requirement for conducting quarterly lease sales and state that "[e]ach proper BLM Sate office **shall** hold sales **at least quarterly** if lands **are available** for competitive leasing." 43 C.F.R. § 3120.1–2 (emphasis added).

This duty is not permissive or discretionary. *See W. Energy All. v. Jewell*, No. 1:16-cv-912, 2017 WL 3600740, at *7 (D.N.M. Jan. 13, 2017) (unpublished) ("BLM is under no such discretion and 'shall' hold lease sales for each state where eligible parcels are available at least quarterly."); *State of Louisiana et al. v. Joseph R. Biden, Jr. et al.*, 2:21−CV−00778, ECF No.139, at 33 (The "MLA requires the [Federal Defendants] to hold lease sales, where eligible lands are available at least quarterly.").

So, when lands are "available" the MLA is clear – the Federal Defendants must hold quarterly lease sales. When the BLM regulations implementing the MLA amendments were promulgated in 1988, the Secretary explained "**[t]he term 'available' means any lands subject to leasing under the Mineral Leasing Act**." 53 Fed. Reg. at 22828 (emphasis added); *See id.* ("The final rulemaking expands categories of available lands in this section to include lands for

which an offer or expression of interest has been received by the proper BLM office.").   BLM's regulations further reiterate that lands "eligible" for leasing become "available" when they are "**included in any expression of interest** or noncompetitive offer."  *See* 43 C.F.R. § 3120.1-1(e) (emphasis added); *see also WEA v. Zinke*, 877 F.3d 1157, 1162 (2017) (BLM's "regulations provide that '[l]ands included in any expression of interest' are 'available for leasing' and 'shall be offered for competitive bidding.'").

When Congress amended the MLA in 1987, it rejected a proposal that would have authorized the Secretary to "delay or postpone" quarterly lease sales.[6]  Following the passage of the 1987 MLA amendments, the Department of Interior concluded that the MLA "requires a quarterly lease sale wherever eligible lands are available for leasing" and the legislative history of the MLA indicates "that Congress did not intend to give the Secretary any discretion in this regard," therefore "[a] sale . . . must still be held each quarter."  Exhibit 2**,** U.S. Department of the Interior Memorandum, "Eligible" and "Available" Land Under the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (1989) at 8 ("DOI Memorandum").  The DOI Memorandum further states that "the obligation to hold quarterly lease sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale," and notes "a lengthy delay in processing oil and gas lease applications must eventually be reported to Congress under [FLPMA] as a withdrawal."  *Id*. at 9.[7]  This is correct because "[a]gencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991).

---

[6] Compare Legislation to Reform the Federal Onshore Oil and Gas Leasing Program: Hearing Before the Sub Comm. on Mining and Natural Resources of the H. Comm. on Interior and Insular Affairs, 100th Cong. 7 (1987), with 30 U.S.C. § 226(b).

[7] A withdrawal of lands from a RMP under FLPMA requires a public and notice comment process to be valid, which has not occurred here.  *See* Section III.B, *infra.*

While section 226(a) of the MLA provides the Federal Defendants discretion on which of the available lands to ultimately include in a sale because the Secretary "may" lease lands from the pool of "[a]ll lands subject to disposition under this chapter," section 226(b) unambiguously states that "[l]ease sales **shall** be held . . . at least quarterly."  30 U.S.C. § 226(a); *id.* at (b)(1) (emphasis added).  "When, as is the case here, Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."  *Main Community Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (internal quotations omitted); *see also U.S. v. Monsanto*, 491 U.S. 600, 607 (1998) (In analyzing statutory language using "shall," stating that "Congress could not have chosen stronger words to express its intent that [the duty] be mandatory.").  Thus, while the Federal Defendants "may" lease lands from the pool of eligible lands, there is a discrete, non-discretionary duty to lease at least some portion of available lands on a quarterly basis (i.e., Federal Defendants have some discretion as to which parcels of available land they may lease, but the duty to hold quarterly leases of available parcels is non-discretionary). Lands are, and have been, "available" in North Dakota in 2021 and 2022, and the Federal Defendants' actions to cancel and refuse to hold all but one quarterly lease sale in 2021 and 2022 violates the MLA's statutory mandate.

The Federal Defendants' established process, governed by their own regulations, for preparing "available" lands for quarterly lease sales supports this conclusion.  Typically, when lands are made "available" through inclusion in an EOI or otherwise, the BLM reviews the nomination and assigns a tracking number.  Declaration of L. Helms at ¶¶ 23-28.  BLM staff then prepares or ensures that the surface management agency (SMA) has prepared a NEPA analysis and appropriate stipulations for leasing of the "available" lands, and posts drafts of these analyses for a 30-day public comment period.  *Id.* at ¶ 27.   These drafts are frequently posted along with

the Notice of Competitive Lease Sale required by 43 C.F.R. § 3120.4–1 and 43 C.F.R. § 3120.4–2. That is because "[p]arcels which receive nominations shall be included in a Notice of Competitive Lease Sale." *Id.* at ¶ 28 (citing to 43 C.F.R. § 3120.3-5).[8]

Importantly, neither BLM (nor the appropriate SMA) determines whether lands are "available." Instead, they review the already "available" lands to determine if the lands have adequate NEPA analyses, whether leasing would be in compliance with resource management plans, and other criteria. Under the MLA these analyses must be conducted on a schedule to meet the statutory obligation to conduct quarterly lease sales: the administrative steps necessary to meet the statutory schedule established by Congress cannot be used as an excuse to violate that duty, as has happened for the 2021 and 2022 calendar years.

Thus, where lands are available, the BLM has a duty to ensure that the necessary steps are taken to hold quarterly lease sales. When the "available" lands with EOIs are under the control of a SMA, BLM has an even reduced role in determining whether those lands should proceed to quarterly leasing. The non-discretionary statutory duty to hold quarterly lease sales would be rendered meaningless and written out of the statute if it could be evaded by unilateral and non-public decisions to simply extend the agencies' internal review time. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018) (Courts "reject[] an interpretation of the statute that would render an entire subparagraph meaningless" because "the Court is obliged to give effect, if possible, to every word Congress used" (internal quotations omitted)); *see also ETSI Pipeline*

---

[8] Where the surface lands are controlled by a different Surface Management Agency ("SMA"), that SMA conducts the NEPA and stipulation review. Declaration of L. Helms at ¶¶ 23-28; *see also* Attachment A to Declaration of L. Helms. The SMA, then grants or denies the necessary consent for the available lands to proceed to leasing, including a NEPA analysis. *See e.g.* 36 C.F.R. 228.102.

*Project*, 484 U.S. at 517 ("[T]he Executive Branch is not permitted to administer [an] Act in a manner that is inconsistent with the administrative structure that Congress enacted into law.").

> ### ii. Federal Defendants have unlawfully cancelled the statutorily mandated quarterly lease sales in North Dakota.

Currently, lands are eligible and available for leasing in North Dakota, and have been since the beginning of 2021.  There have been 875 parcels for which EOIs had been submitted and thus were available in North Dakota (of which 177 had completed the NEPA compliance process).  Declaration of L. Helms at ¶ 34.  Despite the longstanding availability of these parcels, the Montana-Dakotas BLM Office has failed to propose these available lands for a single quarterly lease sale before Q2 of 2023.  *Id.* at ¶ 36.  For many of the 177 available lands, the BLM State Office has also failed to even designate a proposed sale date, demonstrating that the Federal Defendants have no real plans to hold lease sales in North Dakota for these available lands.  *Id.* Because lands were and are available for leasing in North Dakota, the Federal Defendants have unlawfully cancelled quarterly lease sales in the State.

The Federal Defendants have yet to release an official position as to *why* the quarterly lease sales continue to be cancelled in North Dakota.  However, the history beginning at the start of 2021 sheds some light on two potential justifications they may offer to this court, neither of which justifies the Federal Defendants' unlawful cancellations of their statutory duty to hold quarterly lease sales.

> ### a) Executive Order 14008 is not a justification for cancelling quarterly lease sales.

On January 27, 2021 President Biden issued Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, which provides in § 206 direction to the Secretary, consistent with applicable law, to evaluate a **potential** "pause" of new oil and gas leasing on public lands:

> **To the extent consistent with applicable law**, the Secretary of the Interior shall pause new oil and natural gas leases on public lands or in offshore waters **pending completion of a comprehensive review** and reconsideration of Federal oil and gas permitting and leasing practices in light of the Secretary of the Interior's broad stewardship responsibilities over the public lands and in offshore waters, including potential climate and other impacts associated with oil and gas activities on public lands or in offshore waters.

86 Fed. Reg. at 7624-25 (emphasis added).

Executive Order 14008 did not direct the Secretary to indefinitely **cancel** new oil and natural gas lease sales in violation of the MLA **prior to** completion of the "comprehensive review" mandated by FLPMA and NEPA, or prior to provide a reasoned explanation for such change as mandated by the APA.   Instead, Executive Order 14008 further provides that, in conducting the "comprehensive review", the Secretary:

> **shall complete that review in consultation with** the Secretary of Agriculture, the Secretary of Commerce, through the National Oceanic and Atmospheric Administration, and the Secretary of Energy.  In conducting this analysis, **and to the extent consistent with applicable law**, the Secretary of the Interior shall consider whether to adjust royalties associated with coal, oil, and gas resources extracted from public lands and offshore waters, or take other appropriate action, to account for corresponding climate costs.

*Id.* at 7625 (emphasis added).

After Executive Order 14008 was issued, then acting Secretary Scott de la Vega promptly (through Secretarial Order 3395 and regional BLM offices) **cancelled** (not paused) all quarterly oil and gas lease sales scheduled for 2021.  Only the Q2 2022 quarterly lease sale has been held since the issuance of Executive Order 14008, yet the Federal Defendants have not published a public notice in the *Federal Register* explaining or offered the public, including North Dakota, an opportunity to comment on, the behind-the-scenes cancellations of the 2021 and 2022 quarterly lease sales.  Indeed, the only information provided on the BLM's Montana-Dakota's leasing website was to notice a single Q2, 2022 quarterly lease sale, which was held in June of 2022.  *See*

BLM's   Montana-Dakota's   Oil   and   Gas   Lease   Sales   (available   at

https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-

sales/montana-dakotas).    No other lease sales have been noticed or held in that timeframe, nor

has there been any public notice or process for the unlawful cancellations.[9]   The Federal

Defendants have failed to implement Executive Order 14008 "consistent with applicable law"

under the MLA or FLPMA by failing to follow the notice and comment procedures required prior

to cancelling lease sales or withdrawing lands from eligibility, and cannot use that Executive Order

as a shield.[10]

> b)  NEPA reviews and ongoing (but not final NEPA lawsuits) as a justification for cancelling quarterly lease sales.

In North Dakota's 2021 Litigation, the Federal Defendants also claimed that various

lawsuits across the country challenging the sufficiency of their NEPA reviews for prior quarterly

lease sales mandated that the Federal Defendants undergo a comprehensive rework of how NEPA

analyses were conducted as a part of the "ongoing review" required by Executive Order 14008.

*See* 2021 Litigation, ECF No. 22, at 7-9.  None of the NEPA analyses completed on federal lands

available for non-discretionary leasing in North Dakota have been declared unlawful.

The Federal Defendants' unilateral and uncompelled decision to re-open NEPA reviews

(whether done in light of Executive Order 14008 or independent from it) did not render North

Dakota parcels unavailable for quarterly competitive leasing or excuse Defendants' from

complying with the statutory mandate of the MLA to hold quarterly lease sales.  NEPA had long

been in effect when Congress amended the MLA to impose the quarterly lease sales mandate, thus

---

[9] *See* Louisiana Action, ECF No. 219 at 21-22 (Discussing that the Federal Defendants cancelled lease sales "with no reason given" and noting that no lease sales had occurred).
[10] *See also* Louisiana Action, ECF No. 219 at 25 (Discussing that Executive Order 14008 "cannot be applied in a manner consistent with applicable law.")

obligating Defendants to comply with both requirements.  Executive Order 14008 did not authorize Federal Defendants to violate their statutory duty and, to the extent they claim it did, Executive Order 14008 is itself unlawful.[11]  If Federal Defendants choose to re-evaluate their NEPA processes, that does not give them the authority to cancel mandatory quarterly lease sales in North Dakota while that evaluation is being conducted.

The DOI Memorandum states that "the obligation to hold quarterly lease sales carries with it the responsibility to plan the activities necessary to have eligible lands available for sale," and notes "a lengthy delay in processing oil and gas lease applications must eventually be reported to Congress under [FLPMA] as a withdrawal."  DOI Memorandum at 9.  This is correct because "[a]gencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform." *Marathon Oil Co. v. Lujan*, 937 F.2d 498, 500 (10th Cir. 1991); *see also Flint Ridge Development Co. v. Scenic Rivers Assn.*, 426 U.S. 776, 788 (1976) ("[t]he duty to prepare an EIS must yield before 'a clear and unavoidable conflict in statutory authority.'"); *ETSI Pipeline Project*, 484 U.S. at 517 ("[T]he Executive Branch is not permitted to administer [an] Act in a manner that is inconsistent with the administrative structure that Congress enacted into law.").  NEPA does not transform the statutory requirement to conduct quarterly lease sales into a discretionary obligation to be conducted on the Federal Defendants' own indefinite and undisclosed schedule.  *Nat'l Ass'n of Mfrs*., 138 S. Ct. at 632.

---

[11] *See* Louisiana Action, ECF No. 219 at 25 (discussing that the "Executive Branch does not have the authority to stop the process under the MLA or the OCSLA while a review is taking place.")

The Federal Defendants have cancelled all but the Q2 2022 quarterly lease sale in North Dakota, and neither Executive Order 14008 nor any perceived need for a programmatic NEPA review can justify those cancellations.[12]

### B.   The Federal Defendants are Violating FLPMA's Mandatory Requirement to Notice Withdrawals of Eligible Lands from Availability for Quarterly Leasing.

Under FLPMA, the Federal Defendants are required to "develop, maintain, and, when appropriate, revise land use plans which provide … for the use of public lands." 43 U.S.C. § 1712(a).  The Secretary's land use planning objectives are adopted in RMPs, which are finalized and maintained by BLM state offices following public notice and comment under FLPMA and the APA. See 43 U.S.C. § 1712(a); 43 C.F.R. § 1610.1(b).  FLPMA prohibits the Federal Defendants from acting inconsistent with RMPs.  *See Norton v. S. Utah Wilderness All*., 542 U.S. 55, 69 (2004); 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands … in accordance with the land use plans developed by him[.]"); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions … shall conform to the approved plan.").

Similarly, FLPMA imposes detailed procedural requirements on any substantial change in land management policy.  *See, e.g.,* 43 U.S.C. §§ 1739(e); 1712(f); & 1714(h).  This includes specific and express limitations on the authority of the Secretary to withdraw lands from leasing. 43 U.S.C. § 1714 ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section.").  A "withdrawal" of lands from an RMP under FLPMA is defined as "withholding an area of Federal land from settlement, **sale**, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws . . ." 43 U.S.C. § 1702(j) (emphasis added).  Therefore, the

---

[12] *See also* Louisiana Action, ECF No. 219 at 15 (In other words, [the Federal] Defendants called it a "Pause," but it was really a complete "Stop" of the federal leasing process.")

Federal Defendants may only depart from an existing RMP after complying with a formal land use amendment process that includes public participation. *See* 43 U.S.C. § 1714(h) ("All new withdrawals made by the Secretary under this section (except an emergency withdrawal made under subsection (e) of this section) shall be promulgated after an opportunity for a public hearing."); *see also* 43 C.F.R. §§ 1610.1-1610.8.

There are several RMPs governing eligible lands for oil and gas leasing in North Dakota. These include the current North Dakota Resource Management Plan ("North Dakota RMP"), which identifies hundreds of thousands of acres that are eligible for oil and gas leasing in North Dakota.  *See* North Dakota Resource Management Plan and Environmental Impact Statement (EIS) (July 1987), at 40[13] (Oil and Gas Leasing – identifying 206,811 acres eligible for leasing on a case-by-case basis for appropriate stipulations, and 253,583 acres "located under **federal, state, or private surface**") (emphasis added)  Exhibit 3 hereto; North Dakota Resource Management Plan and Environmental Impact Statement, Record of Decision (April 1988), available at https://eplanning.blm.gov/public_projects/lup/68341/101098/123142/rod.pdf).[14]     There are additional RMPs governing lands under SMA control, including the United States Forest Service the United States Army Corps of Engineers ("Corps"), which also identify lands in North Dakota eligible for quarterly oil and gas leasing. *See* Northern Great Plains Management Plans Revisions, Final Supplemental Environmental Impact Statement for Oil and Gas Leasing (December 2020),

---

[13] "At 40" refers to the pdf page.  The label on the bottom of this page is page 20 in the original RMP document.

[14] The BLM issued a notice of a North Dakota RMP Revision and EIS on April 14, 2020, which was last updated on November 3, 2020.  That notice did not include a withdrawal of all federal lands in North Dakota from the leasing program.  The BLM has not noticed any changes in 2021 that would affect the conclusion that lands are available for leasing in North Dakota. *See* North Dakota Resource Management Plan Revision and EIS (available at https://eplanning.blm.gov/eplanning-ui/project/1505069/510).

Exhibit 4 hereto; Garrison Dam/Lake Sakakawea Project Oil and Gas Management Plan (June 2020), Exhibit 5 hereto at 13[15]. As required by law, each of these RMPs was developed and finalized through the public notice and comment process, and included environmental analyses under NEPA stating the lands were eligible for leasing and has passed initial environmental review. Amending these RMPs to withdraw the slate of available and eligible lands for quarterly oil and gas leasing in North Dakota requires an identical public notice and comment process.

BLM has, by dint of their unlawful cancellations, effectively and unlawfully withdrawn the lands in North Dakota identified as available for leasing in the various RMPs. The Federal Defendants have not published a notice in the *Federal Register* proposing changes to the North Dakota RMP reflecting Federal Defendants' cancellation of quarterly lease sales, and thus withdrawal from the North Dakota RMP of any federal lands for Congressionally mandated lease sales, depriving North Dakota of its right to comment on BLM's actions.   Further, the Federal Defendants have not reported these cancellations and indefinite delays to Congress as a withdrawal under the FMPLA as directed by the DOI Memorandum.

Rather than engage in the public process of amending RMPs, making withdrawal notices or reporting to Congress, the Federal Defendants have instead acted silently in the shadows, simply refusing to hold the Q3 and Q4 2021, and Q1, Q3, and Q4 2022 quarterly lease sales, even though "eligible" lands are "available" for leasing in the State. Federal Defendants' decision to cancel the statutorily-mandated lease sales and thus withdraw the federal lands available for lease under the North Dakota RMP for leasing violates the North Dakota RMP, and the requirements of FLPMA.

**IV.     The Balance Of Equities And The Public Interest Favors Compelling The Federal Defendants Follow The Clear Statutory Command In The MLA To Hold Quarterly Lease Sales.**

---

[15] "At 12" refers to the pdf page.  The label on the bottom of this page is "page 10" in the original RMP document.

When determining the balance of equities, this Court must compare the public interests involved "to determine on which side the risk of irreparable harm weighs most heavily." *Blum v. Caldwell*, 446 U.S. 1311, 1315 (1980). For the Court to grant North Dakota's request for a preliminary injunction, North Dakota must establish that the entry of the relief would serve public interest. *States Dakota v. U.S. Envtl. Prot. Agency*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (citing *Dataphase Sys., Inc.*, 640 F.2d at 113).

"[T]he public's true interest lies in the correct application of the law." *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022); *see also Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 141 S. Ct. 2485, 2490 (2021). Even if this Court finds the Federal Defendants' desire to conduct more comprehensive NEPA analyses may be a "desirable end," that cannot outweigh the statutory duties imposed by the MLA and FLPMA. *See States Dakota*, 127 F. Supp. 3d at 1059 ("A far broader segment of the public would benefit from the preliminary injunction because it would ensure that federal agencies do not extend their power beyond the express delegation from Congress.").

Contrastingly, North Dakota has a vested interest in its sovereign right to lease the state and private minerals that are being held hostage by the Federal Defendants' refusal to conduct quarterly lease sales as required by the MLA. Indeed, the entire nation has a strong interest in the proper administration of the oil and gas leasing program as required by the MLA.

Every day the Federal Defendants' unlawful actions are allowed to continue, North Dakota sovereign ability to develop its own state and private mineral interests is impaired. Further, North

25

Dakota and its citizens suffer substantial harm in the form of lost revenues which would fund critical state programs such as infrastructure, educations, and health and human services. Meanwhile, a preliminary injunction creates only a slight inconvenience to the Federal Defendants' agenda. An injunction will require the Federal Defendants to hold the statutorily mandated quarterly lease sales in North Dakota, but will not prevent the Federal Defendants from continuing their (seemingly unbounded and opaque) "ongoing review" of the federal oil and gas leasing program and related NEPA analyses.  Any harm to the Federal Defendants is therefore *de minimis*. Executive Order 14008 directed the Federal Defendants to proceed "[t]o the extent consistent with applicable law." 86 Fed. Reg. at 7624. The Federal Defendants injury (if any) was caused by their decision to ignore the requirements of the MLA and FLPMA by engaging in the wholesale cancellation of quarterly lease sales and withdrawal of eligible lands from the RMPs. The Federal Defendants do not have the right or authority to "pause" their compliance with the law, nor is it in the public interest that they be allowed to do so.  The Federal Defendants benefit from, and are not harmed by, being directed to comply with the law.  The preliminary injunction will allow the Federal Defendants to meet their statutory obligations without interfering with their programmatic review of the NEPA analyses of oil and gas leasing.

Accordingly, the public interest and balance of harms weighs heavily in North Dakota's favor.

## CONCLUSION

For the reasons set forth above, North Dakota respectfully requests that the Court:

1. Hold oral argument on North Dakota's Motion for Preliminary Injunction; and

2. Enter an ORDER granting North Dakota's Motion for Preliminary Injunction:

A. Declaring the Federal Defendants actions of cancelling quarterly lease sales are unlawful;

B. Enjoining and restraining the Federal Defendants under 5 U.S.C. 706(1) and 5 U.S.C. 705 from unlawfully cancelling future quarterly lease sales; and

C. Compelling the Federal Defendants under 5 U.S.C. 706(1) to hold the previously cancelled quarterly lease sales for "available" lands.


Dated: January 9, 2023                               DREW H. WRIGLEY
                                                     ATTORNEY GENERAL
                                                     STATE OF NORTH DAKOTA


                                                     /s/ *Paul M. Seby*
                                                     Paul M. Seby
                                                     Special Assistant Attorney General
                                                     Greenberg Traurig, LLP
                                                     1144 15th St, Suite 3300
                                                     Denver, CO 80202
                                                     Phone: (303) 572-6584
                                                     Email: sebyp@gtlaw.com

                                                     Matthew Sagsveen
                                                     Assistant Attorney General
                                                     Director of Natural Resources and Indian
                                                     Affairs
                                                     600 E. Boulevard Ave Dept. 125
                                                     Bismarck ND 58505
                                                     Phone: (701) 328-2595
                                                     Email: masagsve@nd.gov

                                                     COUNSEL FOR PLAINTIFF
                                                     STATE OF NORTH DAKOTA

<u>**CERTIFICATE SERVICE**</u>

I hereby certify that a true and correct copy of the **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** has been served on this 9th day of January, 2023 via certified mail, return receipt requested upon:

The U.S. Department of Interior
1849 C Street NW
Washington, DC 20240

Debra Ann Haaland, Secretary
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

The Bureau of Land Management
1849 C Street NW
Washington, DC 20240

Tracy Stone Manning, Director
The Bureau of Land Management
1849 C Street NW
Washington, DC 20240

Sonya Germann, Director
Bureau of Land Management
Montana/Dakotas State Office
5001 Southgate Drive
Billings, MT 59101

Merrick B. Garland
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

U.S. Attorney's Office
Civil Process Clerk
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

The U.S. Department of Interior
1849 C Street NW
Washington, DC 20240

*/s/ Paul M. Seby*